Good morning, your honors. Rachel Connor on behalf of defendant appellant Jonathon Nora. This case, as you know, involved the activities at Abide Home Health Care, a home health agency that was owned and run by Lisa Cornell. I'm sure by now that you're all familiar with how the fraud was alleged to have occurred in this case, but Abide from at least 2008 through 2014 was engaged in widespread health care fraud that defrauded the government of millions of dollars. And the conspiracy involved those at the top of Abide, Lisa Cornell and her daughter, Wanesha Jakes, their good friend and the office manager, Wendy Irvin, and then a lot of people on the medical side of the business, doctors who were fraudulently certifying patients for home health care, nurses who were fraudulently coding certain forms in order to get Medicare billing at the highest rates, and marketers and recruiters who were individually receiving kickbacks in exchange for having certain patients enrolled in Abide services. Abide at the time of this conspiracy employed dozens and dozens of employees. There were 120 to 150 people on the payroll, and they served hundreds of patients. So indicted in this scheme were the people at the top management levels, people on the medical side that were defrauding and erroneously coding health care diagnoses that weren't accurate, and the people that were billing and submitting fraudulent billing to Medicare. And Lisa Cornell had convicted of health care fraud. So contrast all of those people with the defendant, in this case, Jonathan Nora, who was a member of the clerical staff, one of a number of people who were on the clerical staff. You can imagine that in a company this large and in dealing with home health care regulations and Medicare regulations, there was an enormous amount of paperwork that was generated. And then in 2012, they converted to an electronic data system. And Jonathan Nora was hired in 2009. He was 22 years old. He had a high school degree and some work experience at Pier 1 retail outlet and at Cox Communications, no experience in home health, no experience in the medical field, no experience in Medicare billing, a person who was competent with keeping track of paperwork. And he is indicted along with these doctors and home health care managers who are actually receiving, in some cases, millions of dollars from defrauding the government. And this case really boils down to, in the brief, I raised three sufficiency of evidence claims that are based on the three, two conspiracy counts and the one substantive health care fraud count, and then sentencing errors. But they all really boil down to whether or not Jonathan Nora had the fraudulent intent required to be convicted of these serious criminal charges. And what happened in the trial was that the government used these labels to kind of characterize what Jonathan Nora's duties were. But when you go back and take a deep dive into the record and look at what his actual duties were, what you find is someone who is very low down on the organization chart, who is doing this work along with a number of other people who were as clerical staff, none of whom were charged. Jonathan Nora was the only one at that level on the clerical side who was actually charged in this indictment. And what you have is someone who is really doing kind of basic administrative duties, fielding calls, taking down demographic data from patients, referring them then to the medical side for whether or not they were appropriate. Then those patients got referred to the billers to determine what kind of health insurance they have. Ms. Conner? I think it's all right for me to jump in. Yes. I read, I mean, you're right. It requires a deep dive. And I read 21 page, 21 days of trial. You've got a strong argument. Yet, you know, with counsel, Mr. Kraft, he chose not to give an opening argument. He put no witnesses on. He didn't testify. He successfully crossed Ms. Crinnell, eliciting from her that he didn't get any of these kickbacks. And then the jury was instructed about mere presence. And then when I read the closing argument that Mr. Nora's lawyer made, it was, ladies and gentlemen, this is just a huge mistake. This is a guy who just worked hard. So the argument you're making to us, is it really that the jury got it wrong when it assessed state of mind? If so, what case ever have we reversed in a health care fraud that we're going to say we don't think they could have inferred a fraudulent state of mind? I think that what happened in the trial was that Mr. Nora was given a fairly lackluster defense and that the government was able to characterize Mr. Nora's behavior in such a way without any pushback from the trial attorney, that Mr. Nora was an office manager, that he was an elite. And I think that the difference between the argument that was made to the jury was that it wasn't specific enough, that the attorney's argument was that Mr. Nora was just doing his job, was just doing his job. Well, just doing your job could be consistent with acting in a fraudulent manner. If doing his job really was coordinating these kickback payments and doing his job really was managing an intake of fraudulent patients, then he could have been doing his job at the same time as he was acting in a criminal manner. I think the difference is that in this case, his job wasn't actually the duties that were presented to the jury. Counsel, let me ask you a question about his compensation. What does the record show was the total amounts of money that he was paid? What was his pay structure and what money was there evidence that he received? So the government conceded in trial that he never received any illegal kickbacks. His compensation at the time that he was hired was at a rate of $13 an hour, which I believe would be commensurate with someone who is doing administrative assistance type of paperwork duties. In 2012, the home healthcare system turned over to an electronic system and Mr. Nora was put in charge of taking all of the paper documents that had previously been used to document all the home healthcare services and transferring them into electronic form. At that point, he was given a raise to $60,000. Ms. Conner, my understanding was, I agree this is a very strange case if it's true that so many of these co-workers on the same level were not indicted, but I thought that he was tied into the ghosting scheme that they were doing. And ghosting is not benign and it doesn't take rocket science to know what's going on. So ghosting was a procedure that was used at Abide where if a patient who had been in home healthcare for too long, according to Ms. Cornell, and that it would raise a red flag, was discharged from the computer system and was continued to be seen and then at some point after 60 days or whatever, would be readmitted. The ghosting, all of those decisions about who was to be ghosted came from Ms. Cornell and came from the top of the organization. Mr. Nora had no ability to discharge or admit or any authority to do any of that in the computer. What he did was receive a case manager. So it went from Lisa Cornell to a case manager, to Jonathan Nora, or any of the other people that were doing data entry. They were given a sheet that said discharge this patient. He discharged the patient in the system. And then when he was given a readmit, he readmitted the person to the system. But there were other people that were on that clerical level that were doing that clerical work. And, you know, part of the issue here is that there was no evidence that Jonathan Nora had any reason to be familiar with any of the Medicare policies or the requirements. This is someone who came in as a 22-year-old and was trained up by someone who was very sophisticated in how to defraud Medicare. And so while the ghosting system itself could raise red flags for why are people being discharged, Mr. Nora had no contact with any of these patients. I thought that he attended weekly or monthly managerial meetings, at least after he became the office manager. He was made an assistant office manager. I think that's what his official title was. There were other people, as I said, on that level. And there was no evidence that at these weekly management meetings, you know, the anti-kickback statute was read out to the employees or that employees were informed that they weren't allowed to give referral fees or employees were made familiar with the requirements of Medicare. I think there was no evidence about what happened at those management meetings. I think I asked you at the beginning, you know, a lot of these health care fraud cases do involve first offenders and the dollar losses are so high, they often do go to trial. So we see quite a lot of these sufficiency attacks on appeal. And I have noticed in our opinions, we often affirm convictions of clerical staff because of aggravating factors. They were owners, they got a kickback, et cetera. But my question to you is the one I asked at the beginning. Can you point me to any Fifth Circuit opinion where we have reversed on insufficiency grounds? Well, I think I named some in the brief and they're not on the tip of my tongue right now, but I think that in contrast, the Murthal case is. Right. I know. I know. I'm sorry to interrupt, but I know in contrast where we justify and deny a sufficiency attack, we often say, look at this in the record, look at this. But have we actually ever said, oh, without those factors, we're going to reverse the jury's determination as to state of mind? I wrote one of those, Steve, but I can't cite it to you right now. OK, I need to find that. Miss Conner, I will look for Judge Jones's opinion. That's great. I think in I think in Ganji there was a case and I think everyone's everyone jumped at Ganji to, you know, because it was a case where there was insufficient evidence. I don't think that case is, you know, it's not entirely on point here because that case involved a doctor who didn't have sufficient knowledge of the entire conspiracy. And I think with that, that case sort of centered on whether or not there was an actual agreement to defraud Medicare. I think in Jonathan's case, there was you know, there is insufficient evidence to show that there's an agreement. But I think, you know, more paramount is is this intent piece where, you know, in the cases that I read from the Fifth Circuit, where office managers were held were held accountable for the actions of the of the companies, were these much smaller held companies where there was an owner, where someone was Before your time runs out, your loss in restitution loss put is him up 20 levels. Those two arguments, though, in your brief are only very short. Would you agree that they're predicated entirely on your insufficiency? In other words, you didn't argue that there should be offsets? You didn't argue that restitute? No. Is that correct? I think that that is the actual loss amount. Like, I agree with the government that that the loss amount was responsible for. I think that Jonathan Norris sufficiency argument and his intent is tied into what was foreseeable to him loss amount. So yes, thank you. I'll reserve the rest of my time. Miss Coates. But Judge Higginson said that your office is often late in signing into these arguments. Is there a reason for that? Um, am I was that late? I just had mute on. Judge, Judge, you're about two or three minutes late. We were all waiting. I just I just pointed out I'm not chastising you and you will go back to your we'll give her we'll start her time again. But I just wanted to point that out because Judge Higginson said it's happened. So just go on. Your Honor, I'm not a technological genius. So I apologize for that. And I need a lot of help. In fact, I have it right here with me because I'm very, very bad with this. And I do apologize. This is my first video argument before you. But I would like to give you a I'm sorry, but I would like to start by giving you specific evidence that Jonathan Nora knew what he was doing. And I have but I have eight instances that I can point to you. And I'll give you the record sites for them. Jonathan Nora was first off the central apparatus for the Medicare fraud conspiracy. That's what that's what the district court said at sentencing. And he he had a role in getting the patients in because he was in charge of the referral process in keeping the patients there because Lisa Cornell told him, do not do not discharge anybody. And he is scheduling these missed visits over and over again. He and then after he's keeping the patients there and do not discharge that's at 7450. He conceals the lengthy stays from Medicare by this process of it. He had initial training that's in his personnel file at three. His personnel file is I believe 327. And I can I can check that. But anyway, his his personnel file was 237. I apologize, but I'm trying to give you the sites. Um, so he's got this initial training in his personnel file. And then he is he is promoted to office manager with a $60,000 pay. Lisa Cornell said it was assistant office manager, but they told the CPA that he was getting 60,000 because he was an office manager. And there's a exhibit, an email to the to the accountant. And that is government exhibit 368, where and will need to Jake's tells the accountant he's the office manager and he gets 60,000. And if you can think of one or two things here, either he is either he is office manager or assistant office manager and getting a pay commensurate to that. Or if you buy the idea that all he's doing is clerical work, he's he's getting paid quite a bit. Just like Bill or Paula Jones was being paid for her husband's kickbacks by a pay raise from 45,000 to almost 100,000. So if you buy the data clerk part, he's being incentivized to stay. He's being incentivized to stay. Not to tell any say their five years. He was promoted in 2013. They went to a four hour long home health care training that was put on by Medicare itself. The Medicare contractor did it and they sat through four hours. And since home health is one of the no, it's the number one most abused part of Medicare. When you're listening for four hours to a Medicare contractor, you're probably they probably mentioned that. And that was in March 2013. And then in there was there was an audit. There's a lot of audits, but there was a particular audit of abide where they abide was told your your patients aren't homebound. Give us give us back three, three or $4 million. And we'll need to Jake's testified that her mother went into a total panic. She started cutting paychecks. And there was quite a curve, awful if you say it that way around the office because the patients weren't homebound. And you can see that in this is a difficult case. I mean, the government brought, I think, 27 defendants and obviously Miss Grinnell was at the top. So it was a 21 day trial, 27 defendants. But this guy, Nora, is clerical. So I really scoured. And here's what I did. I looked at the government 66 page closing and his name only comes up on four pages. Then the district court's trial denial, Nora, maybe not surprisingly, only comes up on two pages of 50 pages. And in all those circumstances, I think very much like the government brief, the record sites are what he did. But his counsel at closing said, yes, he did all the paperwork. The only issue they're arguing is there was no witness that said he knew that this was fraudulent because he didn't profit. So what would help me most, and I think it's the best you get on the brief is on page 21, is any quote from any government witness, including the cooperator in charge of it all, that said, Nora knew we were trying to skirt Medicaid audits with ghosting, or Nora knew we were defrauding, as to just being a good clerical. What witness came closest to saying that he had fraudulent intent? Can you quote the witness's testimony? Lisa Cornell called Jonathan Nora and case manager Gaynelle Leal into her office and specifically told him, do not discharge patients. Right. That's the last, that's the clause you cite at the end of page 21. But all that she says there is she would fire people if they discharged patients. How does that support the statement in the brief that Nora understood his job was to keep patients regardless of medical necessity? That just says Cornell would fire people. How does that show state of mind? It shows state of mind because of the follow-up that he did. He is scheduling all of these nurses to go out and see these patients. And what was happening, and there's a lot of this in the trial, is the patients aren't home when the aides go out there. I know. I guess I would ask you again, what witness most implicated Nora as to knowledge? Not a record cite as to what his work did. Do you have any witness that said, oh, he knew we were going to do this so that Medicaid wouldn't auto? Again, Gaynelle Leal testified to ghosting along with Jonathan Nora. I know they said he ghosted them. But you see, my question is, when I the last thing on this brief on page 21, you drop a footnote and it says, okay, proximity alone to fraudulent activities can lead to an inference of guilt. Right. And it really does seem to me that was the government's against just Nora. I mean, 26 other people may have been very knowledgeable, but your argument really is look at what he did. He must have known. And you cite the Martinez decision. But in Martinez, the staff worker was hiding the cash payments to doctors behind a bathroom cabinet. Is there anything Nora did where we can infer guilty knowledge? Yes, I was I was I was mentioning the missed visits because Beverly Mandoff, a field nurse, testified that she went out two times in a week because they're supposed to they're supposed to see the patients two times a week. She went out two times. The patient wasn't home either time. And then she goes to Nora and Leal and she and another case manager and she her go back out, go back out and keep going until you get these these missed visits filled. And the thing about the missed visits is there were so many of them that and he's scheduling them. You can see that in his payment, in his pay mail. And and Christopher Bradford at one, three, two, seven, zero. And then Beverly Mandoff is one, two, zero, five, zero. So the argument, the government's argument really is he must have known. But even the cooperating woman, the mastermind, admitted he didn't get kickbacks. And she never did say she's your witness. Nora knew we were defrauding. She your argument is, look how embedded. But for him, it couldn't have happened because he was handling all the referrals. That's a powerful argument. Maybe that's enough. But I think it correct me if I'm wrong. It would be beyond any other circuit opinion we've got. Right. He didn't own it. He didn't get kickbacks. And he isn't doing anything that we can see as furtive. He's just in the middle of it all. OK, other evidence that he knew, in addition to missed visits and what the missed visits show, if you have the nurse, if you're scheduling a nurse and she's going out over and over and over and over and over again and nobody's home, I think a reasonable person, you don't have to be a doctor to figure out that they're not that they're not home. They're not home bound. We're home health and the patients are never home. I'm sure you I'm sure you're I'm sure the government pointed that out to the jury. Right. That's one of the essential criteria for home health care. Yes. And that was repeatedly that there was an expert. And the Medicare audit said that for four million, three to four million dollars, those patients aren't home bound. And the and the doctor said those patients aren't home bound. When he was doing the first full circle from taking the call of the referral, tracking the referrals in a tracking log and then going the full circle to hand delivering the pay for referrals to to group operators, to health care, health fairs. People will go out to health fairs and you can do that. You can advertise what you can't do with the health care for the health care fair is is get specific patient information. And they did. But then they get it to prove the fraud. You prove the conspiracy. It's just would you agree with opposing counsel's characterization of him as the most clerical among the charge defendants or not? The district court. OK, two answers. This the district court found it was simple. He was central apparatus, but that's not the main answer. The main answer is he wasn't just clinical. If you look at his duties as working closely with the the case managers, which are the nurses in charge, to keep the the ghosting record. I see in the organization. Is he the lowest? Once he's in the organizational chart that Sheldon Barnes introduced, he was it was in alphabetical order. And that's what he exhibits. But can I get my questions? Sorry, you know, I'm thinking about them. How many how many of these 21 indicted went to trial or whatever it was, went to trial? Four doctors, Bill or Paula Jones and Jonathan Nora. It's only six of them who went to trial. That's true. A lot of the others, all the others played out basically. Yes. Yes. In various ways. Well, what struck me about this was that Mr. Nora gets 40 months. And if he's really guilty, I don't see that as a real high incarceration amount. But a bunch of these other people who were clearly in the know didn't get very lengthy sentences. Right. I mean, that I was shocked, frankly, that so many of them ended up with probation. And you're not attributable to the judge's leniency or did government just decide that? The people who cooperated got lower sentences, except for Lisa Cornell, who got the highest sentence of all, even though she testified in this case. I asked all the 80 months. Right. So she only got double what Nora got. True. And the guideline range was 151 to 183 months. And the way that the district court calculated the sentence is she applied the Hebron finding at 14502 to find that the fraud was so pervasive that it's impractical, not to try to separate the legitimate from the illegitimate and services. So she applied the presumption at 14502 and Nora didn't rebut it. Of the people who plead out, did any of them testify at the trial? Yes. Okay. Now, what strikes me about this, just looking back and away from it, the government simply swept broadly and they knew very well that they're preaching it into a clerical employee. But a clerical employee who would know all the mechanics, he could delta out across the Ts and they wanted him as a witness. And they expected, but he didn't plead out. And, you know, as I was saying, and today's a hindered way to the great district attorney in Dallas County, is that some of those judges charge a lot of for their time. And this goes to the question of Judge Jones asked about the disproportionate sentences. But it also offers up on his face, this reaction to someone who's not exactly a stranger to this process, that why would you freak this person in with the doctors and the people who made the millions and millions of dollars? And he made almost $60,000 at the end of those years and nail him with a $11 million restitution, dah, dah, dah, dah, dah, dah. And what strikes me is that he didn't plead. But it also suggests, I don't know, that the reason he was indicted is that you wanted that employee and he didn't right or wrong, they didn't take that, he didn't go for that. Can you comment about that? The plea bargaining process seems to set this up much as anything else and it translates into the outcome of the case. Well, there were four doctors and then there's Bill or Paula Jones and there's Nora who's who the evidence shows is not only clerical, but he's working with the case managers. He's scheduling the field nurses, but I'm not answering your question. I can with what the district court found at sentencing and that was that he was the central apparatus of the whole conspiracy. He was involved from the referral process to the ghosting process and he was in charge of referrals. He wasn't just doing them on the side, he was the intake. He took the call, he checked Medicare eligibility or, you know, it's a conspiracy, someone helped him with that. He assigned a field nurse to go out. Any guess why Crinnell, who's your cooperating witness, wouldn't have said, yeah, he knew? One question, one answer. I believe on redirect he said Crinnell did say yes, he knew and certainly Monisha Jakes, who was second in command, said he knew. Okay, if redirect of Crinnell, she said he knew, that would end it. Then the jury. And she talks about how he's calling up. No, that's all right. One quick question, counsel. At sentencing, the government opposed the district court's variance downward, in part based on disparities, as we've just been discussing. But therefore, had the government prevailed, he would have served over 10 years, correct? And Ms. Crinnell would have served 80 months. Well, I'm not sure how the argument went with Ms. Crinnell. Didn't the government oppose the downward variance for Norris? Yes, the government did. The government was very committed to his complete participation in the whole process. One other question I have for you, Ms. Copes, is I know all the companion co-conspirators have a separate appeal that was heard about a year ago. That decision hasn't yet been issued. And I noticed that the 28 J's that have been filed, I'm sure from your office, involve loss determination and offset questions. Would you agree that we couldn't decide the conspiracy loss amount in this case until that court decides for the co-conspirators what the total loss amount? Or do you think we should go ahead first? I think it should be together. The sentencing was together, and I wondered why this case didn't go to the same panel because it's related. Nora wasn't severed from this case until right before oral argument. Well, that was because of lawyer substitution. My question to you is, you've been filing 28 J letters, and I commend you for it in that case, but it looks to me like the exact same issue exists in this case. Well, he didn't raise the issue, did he? He did not raise it. And I asked opposing counsel a second ago, but it certainly wouldn't seem appropriate, which is why I'm asking the government, that if an earlier panel on the exact same issue decides the loss should be offset, that we would then go ahead. And I don't know if that's the case. It makes sense for the big case with the four other defendants to go first because the loss number wasn't the same for each defendant, but the total loss is where the five years up until after the search war. And he, other than Sheldon Barnes, he was the, he'd been there for most of these witnesses. I think that's very helpful. I didn't mean to ask questions beyond your time. So I think probably, you know, it's a slight oddity with the two cases and the severance, but probably it's rebuttal time. I don't mean to speak for the I see my time is up. If you have one little answer, you can give it. It makes sense for the four-defendant abide appeal to go first, certainly as far as sentencing goes, because they'll be talking about how the district court arrived at the entire amount, and then she applied the time periods that people were there in her chart at 2704 here and 14502, where there's a haven finding. But it does make sense for the abide to go first. That's enough. Thank you. You have an opportunity for rebuttal, Ms. Connor. Thank you, Your Honor. I just first wanted to push back a little bit, and I know I don't mean to spend too much time doing this, but on the allegation that Mr. Nora was the central apparatus of this scheme, this scheme was born and managed by Lisa Cronall, and she recruited doctors who were in on it and were putting in fraudulent diagnoses, nurses who were saying that they were going out to see patients and were putting in fraudulent coding, and a biller who she knew was going to bill the maximum amount for services, whether they were justified or not. If you look at Government Exhibit 208, it's the flowchart of how referral calls came into the office. It was not – Jonathan Nora was not in charge of referrals. He took the initial – you know, it's like if you have a cover sheet on an application. He took the demographic data, the social security numbers, the contact information, the patient's name, maybe their primary care physician's name, and then it was given to someone on the medical side, the case manager, who was the medical person involved. But the government counsel just a second ago said on redirect, Ms. Cronall directly implicated him as to knowledge. So I think that as to knowledge, what the government has done throughout the case is kind of blur the lines about what the knowledge is. The knowledge, and this was widespread knowledge at Abide, was that referral fees were being paid for patients, not that there was – not that Medicare was being defrauded and not that the doctors were miscoding things, not that – Why isn't that an inference? If ghosting was happening so prevalently and then doctors are being paid for patients, I suppose anyone involved in the machinery, we could infer. Is there a case that says the jury couldn't infer they had fraudulent knowledge along with the doctors and Ms. Cronall? Well, I think what there has to be is more than mere inference, and I think that that's – it's that there has to be more than mere presence around this criminal activity. There has to be a real criminal intent, and if what it was was mere presence, then you would have 150 people at Abide, most of whom didn't benefit from this scheme who would be – Ms. Cronall, the reason I asked you very directly is did you make any loss arguments other than to now say, oh, boy, what about this other appeal? Goodness, but as Judge Jones answered herself to my questions, it doesn't seem like you preserved anything. They may have preserved it, but you didn't. What's your response to that? To your point, I did not raise it. That could be huge. Well, it wasn't raised in the district court either, right? And I suppose that means that this organization really had no bona fide client or patient? No. Agent Bradford testified that 50 percent of the work that Abide was doing was from referrals from doctors who were not on the payroll, and the other 50 percent came from about what percentage of the doctors who were on the payroll were actually referring for legitimate services. Patients were being seen. The problem is that when the services were coded, they were being coded for fraudulent services. I wanted to make one other point about this homebound and the missed visits. The expert did testify that being homebound and being qualified for home healthcare doesn't mean that you are bedridden. You are able to leave for doctor's appointments. You're able to leave for religious services. There are all kinds of things that are exceptions to this homebound status that would account for a patient not being home when a nurse went to go see that person. So just a missed visit on its own would not be enough. Even though the loss was high, she varied way down. Then she found that he's indigent. He doesn't have any loss. As to restitution, he's only going to pay $50 per month for three years of supervised release, so he's not actually going to get hit by much, right? I wanted to make two points on that and with the plea bargaining aspect that the nurses who were able to plea bargain, the clerical staff that was able to plea bargain, they were able to plea bargain in such a way that they kept their nursing licenses. These are people who are still working in their field. Jonathan Noor, because of this conviction, can't ever work in a medical field. With respect to the restitution, because he's indigent, it's $50 a month, but he was assessed with $12 million of restitution. So at any point, if he were to gain employment, that number of $50 a month would go up until that $12 million is paid. It's like you have $12 million in student loan debt that never goes away. So that $50 is based on his current circumstances and current not carrying student loan debt, not having any assets, being qualified for CJA counsel. And to the point about the offset amounts, to the extent that an effective lawyer should have raised those issues on appeal for Mr. Noor, there was no strategic reason for me not to have put those in. So to the extent that it's plain error, I encourage the court to look at that. But there was no good reason for those errors on the amount not to be raised. Okay. We have your argument. Ms. Connor, you were court appointed. And this is a very complex case. So we thank you for your service. And you made it through, Ms. Copes. Hopefully, we won't have too many more of these. So thank you very much. Thank you. Have a nice day.